## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: PARAGARD IUD PRODUCTS LIABILITY LITIGATION | ) MDL No. 2974 <br> ) <br> ) 1:20-MD-02974-LMM <br> ) |
| THIS DOCUMENT RELATES TO: | ) <br> ) |
| PAULINE RICKARD | ) 1:21-cv-03861-LMM <br> ) <br> ) |

## TEVA'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants Teva Pharmaceuticals USA, Inc., Teva Women's Health, LLC, and Teva Branded Pharmaceuticals R&D, Inc. (collectively "Teva") renew their motion for judgment as a matter of law on each of Plaintiff's remaining claims in this case. Under Fed. R. Civ. P. 50, a court should render judgment as a matter of law when a party has been fully heard on an issue and "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004); *see* Fed. R. Civ. P. 50(a)(1). Here, the parties have been fully heard on the issues in this case, and a reasonable jury could not find that there is a legally sufficient evidentiary basis

1

to find in Plaintiff's favor on any of her claims. Judgment as a matter of law therefore is proper in the entirety, and this case should proceed no further.[1]

## ARGUMENT

### I.    Plaintiff's claims are preempted by federal law.

Teva re-asserts the preemption arguments presented in its Rule 50(a) motion submitted at the close of Plaintiff's case (Dkt. No. [232], as well as those in Teva's summary judgment motion on federal preemption (Dkt Nos. [42, 92]).

### II.    Judgment as a matter of law is appropriate on Plaintiff's strict liability failure to warn claim.

To prove her failure to warn claim, Plaintiff must show "(1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact suffered an injury from using the product." *Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021) (citation omitted). Florida's learned intermediary doctrine applies to any claim involving a prescription drug premised on a failure to warn, no matter the theory,[2] and provides that the manufacturer's duty is to warn the prescribing physician. *Pringle v. Johnson & Johnson*, No. 13-81022-

---

[1] Teva previously moved for judgment as a matter of law on Plaintiff's general negligence claim and her requests for physical impairment damages and future damages. *See* Dkt. No. [232] at 17-18, 20-21. But the Court did not include these claims in its final jury instructions. As such, Teva does not renew its motion as to those claims because the jury will not be considering them.

[2] *See, e.g., Beale v. Biomet, Inc*., 492 F. Supp. 2d 1360, 1372 (S.D. Fla. 2007); *Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260, 1267 (S.D. Fla. 2020).

CIV, 2020 WL 4501834, at *3–4 (S.D. Fla. Jan. 30, 2020) (citing *Hoffmann-La Roche Inc. v. Mason*, 27 So. 3d 75, 77–78 (Fla. Dist. Ct. App. 2009)). As the Court recognized in its summary judgment Order, "[i]t therefore follows that if Teva adequately warned Dr. Chlouber of the risk of Paragard breakage," Plaintiff's failure-to-warn claims must be dismissed. Dkt. No. [149] at 7.

### A.    The Paragard label adequately warns physicians of the risk that Paragard can break during removal.

The assessment of a warning's adequacy considers all of the learned intermediary's knowledge and experience as well as whether he independently knew the risks. *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1279-80 (S.D. Fla. 2020), *aff'd*, 854 F. App'x 316 (11th Cir. 2021). The adequacy of a warning is "a question of law where the warning is accurate, clear, and unambiguous." *Felix v. Hoffmann-LaRoche, Inc.*, 540 So.2d 102, 105 (Fla. 1989). And "[a] warning is adequate as a matter of law when it makes apparent the potential harmful consequences of the product." *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1348 (11th Cir. 2023) (internal quotation marks omitted). Thus, when a manufacturer warns of "the condition experienced by [the plaintiff]," the warning is adequate. *Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990). Adequacy is viewed through the lens of a reasonable provider: under the learned intermediary doctrine, "the warning 'will be read and considered by a trained expert.'" *Cates*, 73 F.4th at 1348.

Here, Plaintiff experienced breakage of her Paragard, which necessitated a hysteroscopy and D&C to remove the broken arm. The Paragard label in place at the time Plaintiff received her Paragard adequately warns physicians of this potential risk.

The relevant Prescribing Information advised physicians under "WARNINGS" that "[p]atrial penetration or embedment of ParaGard in the myometrium can make removal difficult. In some cases, surgical removal may be necessary." PX706, 2012 Paragard Label. It also advised physicians, under "Continuing Care," that **"ParaGard® can break"** and **"[i]f there is evidence of** partial expulsion, perforation, or **breakage, remove Paragard.** *Id.* Moreover, it advised physicians, under the heading of "How to Remove ParaGard®," that "[e]mbedment or **breakage of Paragard®** in the myometrium can make removal difficult." *Id.* In other words, the labeling warned Plaintiff's physician, Dr. Chlouber, of "the exact consequence[s] [Plaintiff] now faces." *Cates*, 73 F.4th at 1348.

Plaintiff's prescribing physician and Plaintiff's own experts also admitted these facts at trial during Plaintiff's case-in-chief. *See* Chlouber Dep.[3] at 60:6-11 ("Q. So do you agree that the Paragard labeling is informing doctors that one of the things – one of the potential complications that can occur after placing a Paragard is

---

[3] All deposition citations refer to the ruled-upon deposition designations that were played during trial.

that you can have partial expulsion, perforation, or breakage of the Paragard? A. Yes."); *id.* 61:3-8 ("Q. Is it fair to say that the Paragard labeling at the time that you placed Ms. Rickard's Paragard is warning doctors like yourself of the risk of the Paragard breaking? A. Yes."); Jan. 22, 2026 Trial Tr. (Rough) at 145:13-17 (Dr. Kessler admitted that the risk of breakage is included in the "Continuing Care" section of the operative label); *id.* at 145:18-146:15 (Dr. Kessler admitted that the operative label warns that breakage *or* embedment can make removal difficult); *id.* at 151:11-17 (Dr. Kessler admitted that the words "break" or "breakage" appear three times in the operative label).[4] Plaintiff's medical expert Dr. Labib Ghulmiyyah admitted that *all* IUDs are subject to potential embedment and breakage, and that it is common sense that embedment can lead to breakage. Jan. 28, 2026 Trial Tr. (Rough) at 83:3-10, 84:14-17, 87:21-23. Dr. Ghulmiyyah further admitted that he is aware that breakage can occur without embedment. *Id.* at 83:3-10. He agreed that breakage is a rare event, but he has known of this risk since his residency. *Id.* at 87:17-20, 87:24-88:4. In fact, with respect to the risk that an IUD can break inside a

---

[4] Plaintiff relies heavily on Dr. Kessler's testimony that the Paragard label in place in 2012 failed to adequately warn of the risk of breakage because that risk was not contained in the Adverse Reactions or Warnings section of the label. *See* Dkt. No. [236] at 8-9. But Dr. Kessler's testimony was limited to whether the Paragard label was adequate from a *regulatory* perspective, *i.e.*, whether Teva complied with FDA labeling regulations. As the Court acknowledged in its jury instructions, "even if [the jury] find[s] that Teva failed to comply with an FDA regulation or guidance, [the jury] may not hold Teva liable on any of Plaintiff's claims merely because Teva failed to comply." Final Pre-Closing Instructions at 6.

patient, Dr. Ghulmiyyah admitted that "logically, we do know that. Every physician would know that[.]" *Id.* at 88:3-4.

After Plaintiff rested her case, Teva presented additional evidence supporting the adequacy of the Paragard label to inform physicians of the risk of breakage. Teva's expert Dr. Ted Anderson testified that he first read the Paragard label in 1993 when he was learning to place the product during his residency, and he explained that physicians are taught to read the label in its entirety, not just specific sections. *Id.* at 186:8-20; *id.* at 189:10-13 (opining that a reasonable physician would read the Instructions for Use section of the Paragard label); *id.* at 189:17-21 (opining that the fact that the Continuing Care section is on the back of the Paragard label "should have no impact . . . . They should read the entire label."). Dr. Anderson then discussed the operative Paragard label at the time of Plaintiff's placement and explained that the label's embedment warnings in the Adverse Reactions and Warnings sections of the label inform physicians that breakage is a possibility with an embedded Paragard: "it's associated with embedment. It's a consequence of embedment." *Id.* at 187:2-188:5. Thus, Dr. Anderson opined that physicians did not need a separate warning for breakage to understand that breakage was a risk associated with removing an embedded Paragard. *Id.* at 188:6-11. Further, Dr. Anderson reviewed the Continuing Care section of the label and again opined that this section's discussion of breakage and the need for removal adequately informed physicians of the risk of breakage:

"As a physician, I'm a conceptual learner, meaning that I learn about occurrences of events in the context in which they occur. So it makes more sense to put this information in the context of removal, which is where breakage typically occurs. It makes it easier for me to remember that's a possibility." *Id.* at 190:7-191:6.

Teva also presented testimony from Dr. Sarah Horvath that Plaintiff's Paragard was likely embedded at the time Dr. Kero removed it. Jan. 29, 2026 Trial Tr. (Rough) at 17:17. Specifically, Dr. Horvath noted that the location of the broken Paragard arm was consistent from the time Dr. Kero's ultrasound to the time of removal, suggesting that it had remained in the same place during that time period. *Id.* at 53:16-20. Dr. Kero also pointed to the language from Dr. Kero's records indicating that Plaintiff had a retained portion of an "impacted partial IUD" and explained that she understands the term "impacted" to be synonymous with "embedded;" indeed, she is not aware of any other clinical use for the term "impacted" in these circumstances. *Id.* at 52:22-25. Additionally, Dr. Horvath noted that the broken Paragard arm did not float in the hysteroscopic fluid during the removal procedure, further suggesting that it was embedded in the uterine wall. *Id.* at 54:7-12. Finally, Dr. Horvath pointed out that Dr. Kero had to use a curette to dislodge the Paragard arm from the uterine wall during the hysteroscopy and D&C. *Id.* at 54:15-21. These facts undermine Plaintiffs' experts' opinions about the placement of risk information on the Paragard label, as embedment was clearly

included in the Warnings and Adverse Reactions sections on the front of the label at the time of Plaintiff's placement.

Considering the Paragard's label itself (including its warnings for both embedment and breakage) , Dr. Chlouber's knowledge of Paragard's risks, and the testimony of the parties' experts, no reasonable jury could conclude that Paragard's label inadequately warned of the risk of breakage. Teva is entitled to judgment as a matter of law on this claim. The Court should not allow this claim to proceed to the jury on Dr. Kessler's theory that the Paragard label was inadequate from a purely regulatory perspective, or on Dr. Ghulmiyyah's theory that a warning addressing an admittedly known risk of the product cannot be adequate unless it appears in a specific section of a label that, as Dr. Anderson explained, would be read in its entirety by reasonable physicians.

**B.    Plaintiff lacks evidence that any defect in the warnings was the proximate cause of her injury.**

Florida law is clear that under the learned intermediary doctrine, "it is *plaintiff's burden* to establish the causation element by showing that adequate warnings would have altered the treating physician's decision to prescribe the device at issue." *Swintelski v. Am. Med. Sys., Inc.*, 521 F. Supp. 3d 1215, 1219–20 (S.D. Fla. 2021), *recon. denied*, 2021 WL 1902233, at *3 (S.D. Fla. Apr. 21, 2021). Where the physician would have prescribed the product despite inclusion of the warnings that the plaintiff claims were needed, there is no proximate cause on a warnings

claim. *Swintelski*, 2021 WL 1902233, at *2-3; *Salinero*, 995 F.3d at 964-65 (plaintiff must show that prescribing physician "would not have used the product had adequate warnings been provided.").[5]

There is no evidentiary basis for a reasonable jury to find that an inadequate breakage warning in the Paragard label proximately caused Plaintiff's injuries. Plaintiff cannot satisfy her burden on the element of causation for three reasons. First, Dr. Chlouber did not rely on the Paragard's allegedly inadequate warnings when deciding to prescribe the Paragard to Plaintiff. Second, Dr. Chlouber testified that he was independently aware of the risk that Paragard could break before he placed the product in Plaintiff. Third, Dr. Chlouber did not testify that a different or additional warning about breakage would have changed his decision to prescribe the Paragard to Plaintiff.

### 1. Dr. Chlouber did not rely on the Paragard warnings in deciding to prescribe the product to Plaintiff.

Where a physician does not read or rely on the labeling containing warnings for the product, the causal chain is broken. *Rounds v. Genzyme Corp.*, No. 8:10-CV-2479-T-23, 2011 WL 692218, at *3 (M.D. Fla. Feb. 18, 2011), *aff'd,* 440 F. App'x

---

[5] This Court should reject Plaintiff's contention that the learned intermediary doctrine may not apply in this case due to the presence of alleged unidentified "misstatements" in the Paragard label, as that contention is directly contrary to the Court's jury instructions, which incorporate the learned intermediary doctrine for all of Plaintiff's warning-based claims. *See* Dkt. No. [232] at 12-13

753 (11th Cir. 2011) (physician's failure to read the drug's package insert was fatal to the plaintiff's claim because "[t]he causal link between a patient's injury and the alleged failure to warn is broken."); *Fields v. Mylan Pharms.*, Inc., 751 F. Supp. 2d 1260, 1263 (N.D. Fla. 2009).

Dr. Chlouber testified that Teva did not teach him how to place a Paragard, and he never had any discussions with anyone from Teva about Paragard's risks and benefits. *Id.* at 40:20-22, 43:3-7. Further, while Dr. Chlouber stated that he had read the Paragard label during his residency in 2007, he had no recollection of reviewing the label after that time. *Id.* at 47:9-48:9. More specifically, he admitted that he has no recollection of reviewing the Paragard label just prior to Plaintiff's placement and was not familiar with the label at the time. *Id.* at 47:5-8, 48:12-17. And crucially, he testified that he did not rely on Teva to inform him of the risk of Paragard breakage because he was already aware of that risk at the time of Plaintiff's placement. *Id.* at 87:15-88:4. In short, Plaintiff presented no evidence indicating that the Paragard label had any impact on Dr. Chlouber's prescribing decision.

Because Dr. Chlouber did not rely on any allegedly inadequate warning in deciding to recommend the Paragard to Plaintiff, a reasonable jury could not find that an inadequate warning was a legal cause of her injuries. Thus, her failure to warn claims should not be submitted to the jury.

### 2. Dr. Chlouber was independently aware of the risk that Paragard can break during removal.

Where a physician has "prior knowledge" of the risks alleged, "any inadequacy in the . . . warning could not have been the proximate cause of the [injury] in this case." *Felix*, 540 So.2d at 105. Here, Dr. Chlouber testified that many sources inform his knowledge of the risks of a drug, including his education and experience and review of medical literature. *Id.* at 20:22-21:3. Dr. Chlouber stated that he learned of the risk of breakage during his residency and thus has been aware of that risk throughout the entirety of his time in practice. *Id.* at 36:24-37:14. He also stated that he was aware at the time of Plaintiff's placement that breakage could make removal of the Paragard difficult and would require an additional surgical treatment to resolve. *Id.* at 37:15-38:2; *id.* at 87:15-88:4 (stating further that he did not depend on Teva to provide this information to him). Dr. Chlouber's independent awareness of the relevant risk in this case breaks the chain of causation, and Teva is entitled to judgment as a matter of law on her failure-to-warn claims for this additional reason.

### 3. Dr. Chlouber would not have altered his treatment decision.

Florida law is clear that in a prescription drug case where the learned intermediary doctrine applies, "it is plaintiff's burden to establish the causation element by showing that adequate warnings would have altered the treating physician's decision to prescribe the device at issue." *Swintelski v. Am. Med. Sys.,*

11

*Inc.*, 521 F. Supp. 3d 1215, 1219–20 (S.D. Fla. 2021), *recon. denied*, 2021 WL 1902233, at *3 (S.D. Fla. Apr. 21, 2021). Where the physician would have prescribed the product despite inclusion of the warnings that the plaintiff claims were needed, there is no proximate cause on a warnings claim. *Swintelski*, 2021 WL 1902233, at *2–3 (citing also, e.g., *Hubbard v. Bayer HealthCare Pharm. Inc.*, 983 F.3d 1223, 1236 (11th Cir. 2020) and *Dietz v. SmithKline Beecham Corp.*, 598 F.3d 812, 816 (11th Cir. 2010) (applying Georgia law, which like Florida also recognizes the learned intermediary doctrine, *id.* at 816 n.2, and ruling that a plaintiff cannot overcome the doctrine "where a treating physician would have prescribed the same drug treatment.").

In its summary judgment Order, the Court cited *Small v. Amgen, Inc.*, 723 F. App'x 722, 725 (11th Cir. 2018) (cleaned up), for the proposition that a failure-to-warn claim is barred "'where a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken *the same course of action* even with the information the plaintiff contends should have been provided.'" Dkt. No. [149] at 11 (emphasis added). The Court then concluded that there "is a genuine issue of material fact as to whether Dr. Chlouber . . . would have taken the same course of action had he received [the warnings Plaintiff advocates]." *Id.* at 11-12.

In support of its conclusion, the Court cited Dr. Chlouber's testimony "that if he learned that adverse events happened more often or with greater severity than he

originally believed, he would reevaluate his risk/benefit analysis or the warnings he would discuss with his patient." *Id.* at 12. Thus, the Court did not consider whether there was any evidence that Dr. Chlouber continues to believe even today that Paragard has an acceptable risk profile for the benefits he is trying to achieve with his patients. Instead, the Court used a broader "course of action" standard and concluded that because Dr. Chlouber would reevaluate his risk/benefit analysis or the warnings he would discuss with his patient, summary judgment was not appropriate.

The broad causation standard cited by the Court is inconsistent with the learned intermediary doctrine. The Eleventh Circuit's ruling in *Small* must be read in the context of the facts of the case. Specifically, the record in *Small* showed that the physician knew infections were possible from taking the drug, but she "*prescribed* it for [the plaintiff] anyway because the benefits outweighed the risk." 723 Fed. App'x at 725. Thus, *Small* does not stand for the proposition that ***any*** evidence that a physician would consider additional information or change his risk-benefit analysis ***generally*** is sufficient for a reasonable jury to find that an allegedly inadequate warning caused a plaintiff's injuries. Instead, under Florida law, it Plaintiff's burden to establish that the Dr. Chlouber would not have prescribed the Paragard if he had received the warnings Plaintiff believes to be necessary. *Swintelski*, 2021 WL 1902233, at *2 (rejecting the plaintiff's attempt to reframe the

inquiry as "whether, knowing what he knows today, [the physician] would have, in the more general sense, altered his 'prescribing practices' by relaying additional information to his patient" and concluding that the learned intermediary doctrine "focuses on the decision of a physician to implant the device at issue"); *see id.* ("[T]he relevant question for purposes of establishing proximate cause under Florida's learned intermediary doctrine is whether the physician would have altered his/her implanting *decision*—not on whether the physician would have altered his communication to his patient"); *see also id.* (citing multiple federal district court, Florida, and Eleventh Circuit cases holding a plaintiff cannot prove proximate cause where the evidence does not show that the treating physician would not have prescribed the product had the warning the Plaintiff advocates been provided).

Here, a reasonable jury could not reach the conclusion that Dr. Chlouber would not have prescribed Paragard for Plaintiff if he received an alleged "adequate" breakage warning. As discussed above, Plaintiff presented non-specific testimony during her case in chief indicating that Dr. Chlouber would re-evaluate his risk-benefit discussion with patients if he "learned that the risks of a birth control happened more frequently or with greater severity than [he] originally believed." *Id.* at 85:14-18, 85:20. This evidence, on its own, is insufficient to show that Dr. Chlouber would have changed his decision to recommend the Paragard to Plaintiff. In fact, Plaintiff did not present any evidence demonstrating that the risk of Paragard

breakage (as opposed to the vague "risks of a birth control") occurs more frequently or are more severe than Dr. Chlouber understood them to be at the time of Plaintiff's placement.

Teva, on the other hand, presented clear testimony from Dr. Chlouber stating that he believed the knowledge he has today, Dr. Chlouber continues to believe that the benefits of Paragard outweigh its risks. *Id.* at 76:19-77:2. Indeed, he benefits of Paragard outweighed its risks when he prescribed it to Plaintiff and continues to hold that belief today. *Id.* at 16:21-17:10. Those risks included the risk of breakage because, as explained above, Dr. Chlouber learned about the risk of breakage during his residency, well before he placed Plaintiff's Paragard. *Id.* at 36:24-38:2. He stated that he believed at the time of Plaintiff's placement that Paragard had an acceptable risk profile for the benefits he was hoping to achieve with his patients. *Id.* at 76:12-16. And even armed with continues to prescribe Paragard to his patients. *Id.* 17:14-16; *Hubbard v. Bayer HealthCare Pharmaceuticals Inc.*, 983 F.3d 1223, 1236 (11th Cir. 2020) (applying Georgia's learned intermediary doctrine and concluding that evidence that a physician changed his communication practices about a drug after a label update said nothing about his decision-making regarding whether to prescribe the drug generally or whether the new label would have impacted his decision to prescribe the drug to the plaintiff, especially where he continued to prescribe the drug after the label update); *Hoffman-LaRoche Inc. v. Mason*, 27 So. 3d 75, 77-78

(Fla. 1st Dist. Ct. App. 2009) (reversing trial court's denial of defendants' motion for directed verdict because there was no evidence to establish proximate cause where physician knew there was at least a possibility of causal relationship between drug and complained-of risk, and he testified that he would still be willing to prescribe drug and "even if the warning label contained all of the information suggested by [the plaintiff's] expert, he would still have prescribed the medication for [the plaintiff]").

Faced with this testimony, no reasonable jury could find that an inadequate warning in the Paragard label was the cause of Plaintiff's injuries. For this additional reason, her failure to warn claims should not be submitted to the jury. Applying a broader standard that assumes a physician would inform a physician of every conceivable risk of a drug and accounts for the patient's reaction to new risk information would be contrary to the learned intermediary doctrine.[6]

---

[6] *See Thornton v. Ethicon, Inc.*, 2021 WL 4437978, at *14 (D. Ariz. Sept. 28, 2021) (granting summary judgment on failure to warn claim where implanting surgeon testified that additional warnings may have affected her informed consent discussion, but "Plaintiff has failed to present any countering evidence to create a triable issue on whether additional warnings would have caused Dr. Sherman to make a different recommendation."); *Labiche v. Johnson & Johnson*, 2021 WL 3719554, at *1 (S.D. Tex. Aug. 19, 2021) (granting summary judgment on failure to warn claim and finding that physician's testimony that additional warnings might have "made her investigate other possible treatments . . . is different than saying that it would have changed her ultimate decision.").

**III.    Judgment as a matter of law is appropriate on Plaintiff's strict liability design defect claim.**

There is no legally sufficient evidentiary basis on which a reasonable jury could find for Plaintiff on her remaining design defect theories.

### A. Plaintiff has presented insufficient proof that Paragard's design is unreasonably dangerous under the risk-utility test or the consumer-expectations test.

To assert a design-defect claim under Florida law, Plaintiff must prove "[f]irst, that the product is defective; and second, that such defect caused plaintiff's injuries." *Cates*, 73 F.4th at 1350-51. Expert testimony is required for both elements, and if the plaintiff's expert testimony is grounded in "pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Pierre v. Intuitive Surgical, Inc.*, 854 F. App'x 316, 319-20 (11th Cir. 2021).

Florida courts apply one of two tests to determine defectiveness—the risk-utility test or the consumer-expectations test. *Cates*, 73 F.4th at 1351. Teva maintains that the risk-utility test applies where, as here, the product at issue "is a complex [pharmaceutical product] available to an ordinary consumer only as an incident to a medical procedure." *Cavanaugh v. Stryker*, 308 So. 3d 149, 155 (Fla. 4th Dist. Ct. App. 2020) (consumer expectations test "cannot logically be applied" in these circumstances). Based on the facts presented at trial, no reasonable jury could find

17

that Paragard's risk of breakage outweighs its benefits. *See* Fla. Pattern Civ. Jury Instruction 403.7(b).

Paragard is an FDA-approved prescription drug and has been on the market for nearly 40 years, using the same FDA-approved materials. Jan. 21, 2026 Trial Tr. (Rough) at 78:15-19; Joseph DeVito Dep. (Jun. 3, 2025) at 337:16-18. Multiple witnesses, including Plaintiff's regulatory expert Dr. David Kessler, have testified that the FDA's approval signifies that Paragard is safe and effective. Joseph DeVito Dep. (Jun. 3, 2025) at 305:23-36:9; Jan. 22, 2026 Trial Tr. (Rough) at 102:5-10 (Dr. Kessler admitted that "for the FDA to approve a medicine or a drug product like Paragard, it must determine that the available testing demonstrates that the medicine is safe and effective for its intended conditions of use").

As Plaintiff's expert Dr. Labib Ghulmiyyah explained, prescribing physicians consider both the risks and benefits of a product when deciding whether it to offer it to a patient. Jan. 28, 2026 Trial Tr. (Rough) at 74:10-14. Thus, in assessing Paragard's overall risk profile, a reasonable medical provider must consider the fact that Paragard is an important contraceptive option for women, and in some cases, it is the only option. As one Teva company witness stated, "Paragard is a really important product for women of reproductive age. It's the only product like it on the market." Jennifer Gates Dep. (Jun. 24, 2025) at 215:8-10.

Dr. Ghulmiyyah agreed that Paragard is 99% percent effective at preventing pregnancy (its intended function), and he continues to prescribe the product for his own patients (as he has done since his residency in 2001). Jan. 18, 2026 Trial Tr. (Rough) at 23:4-8, 72:14-73:1, 77:1-3; *see also* Jan. 29, 2026 Trial Tr. (Rough) at 20:19-21:2 (Dr. Horvath opined that Paragard is safe and effective, in part, because it is non-hormonal and is 99% effective at preventing pregnancy). Dr. Ghulmiyyah also admitted that no professional medical organization, including ACOG, has ever determined that the risks of Paragard outweigh its benefits. *Id.* at 77:10-78:16. Finally, Plaintiff also testified that Paragard had multiple benefits that were appealing to her – "it was an in-office procedure, it could be left in for up to 10 years, and I could choose to remove it at any time by going to my doctor's office. And I remember reading it was safe and effective." Jan. 27, 2026 Trial Tr. (Rough) at 67:15-18; *see also* Chlouber Dep. at 50:21-51:25 (Dr. Chlouber stated that he counsels patients on the benefits of Paragard, which include "very high effectiveness and long lasting.").

Despite his knowledge of the risk of breakage, and despite the fact that he has placed "hundreds" of Paragards, Dr. Chlouber has never encountered a patient with a broken Paragard in his career. Chlouber Dep. at 17:24-18:6, 53:5-8. Likewise, Dr. Niloufer Kero, the physician who removed Plaintiff's Paragard, testified that Plaintiff is the only patient she has treated for a broken Paragard, and she has placed

"more than hundreds." Kero Dep. at 30:3-7, 44:2-7. Based on this evidence, no reasonable jury could find that the risk of breakage upon removal – a rare risk[7] that was included in the operative Paragard label – outweighs the product's numerous important benefits.

Alternatively, even if this Court instructs only on the consumer-expectations test, Plaintiff has failed to present sufficient evidence to meet her burden of proof. Under that test, a product is unreasonably dangerous if it "failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 503 (Fla. 2015). In cases involving the learned intermediary doctrine, "the relevant expectations are those of the medical professional" because "complex medical products . . . are provided to a consumer through a learned intermediary." *Cavanaugh*, 308 So.3d at 156 156.[8]

---

[7] *See* Jan. 23, 2026 Trial Tr. (Rough) at 154:7-9 (Dr. Mays admitted that he reviewed literature describing the risk of breakage as rare); Jan. 28, 2026 Trial Tr. (Rough) at 87:17-20 (Dr. Ghulmiyyah admitted that IUD breakage is a rare event); *see also* Jan. 29, 2026 Trial Tr. (Rough) at 174:8-13 (Dr. Horvath described the risk of Paragard breakage as "very rare").

[8] As this Court's jury instructions correctly recognize (*see* Final Pre-Closing Instructions at 9), the "ordinary consumer" in this case is an objectively reasonable medical professional. Thus, Plaintiff's expectations for the Paragard are irrelevant to Teva's liability under the learned intermediary doctrine because physicians are not required to inform patients of every conceivable risk that Paragard might pose. *See Buckner v. Allergan Pharms., Inc.*, 400 So. 2d 820, 824 (Fla. 5th DCA 1981) ("Since physicians do not have an absolute duty to inform patients of all possible side effects in every instance, failure to do so in a particular instance should not give

Under Florida law, Teva was not under a duty "'to design a product which is totally incapable of injuring' consumers." *Cates*, 73 F.4th at 1353 (quoting *Greico v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 19 (Fla. 4th Dist. Ct. App. 2022)). That is why the FDA-approved Paragard comes with FDA-approved warnings of its known risks. Plaintiff did not (and could not) present evidence that "an objectively reasonable medical provider would believe that [the risk of breakage] is not a potential side effect of [the product]." *Cates*, 73 F.4th at 1353.

As discussed above, the Paragard label at the time of Plaintiff's placement informed physicians that "Paragard can break, perforate the uterus, or be expelled" and instructed them to remove the Paragard "[i]f there is evidence of partial expulsion, perforation, or breakage[.]" PX706. The label further warned that "[e]mbedment or breakage of Paragard in the myometrium can make removal difficult." PX706; Chlouber Dep. at 60:12-61:03. Dr. Chlouber learned of the risk of

---

rise to the manufacturer."); *E.R. Squibb and Sons, Inc. v. Farnes*, 697 So. 2d 825, 827 (Fla. 1997) ("Whether the physician in fact reads the warning, or passes its contents along to the recipient of the drug is irrelevant [to the learned intermediary doctrine]."); *see also Tutwiler v. Sandoz, Inc.,* 726 F. App'x 753, 757 (11th Cir. 2018) ("[Plaintiff] claims that she would not have taken amiodarone had she known of its dangerous effects. Regardless of what [Plaintiff] would or would not have done with the information, Alabama law requires a showing of what [the prescribing physician] would have done with it."); *Fox v. Ethicon, Inc.,* 2016 WL 3748509, at *4 (S.D. W. Va. July 8, 2016) ("The plaintiffs' argument that the court should consider what Ms. Fox would have done had she been adequately warned (i.e., deciding to refrain from having the TVT surgery) is unpersuasive . . . . What the plaintiffs would or would not have done had they received certain warnings is irrelevant to the learned intermediary doctrine.").

breakage during his residency in 2007, and he continues to prescribe Paragard to his patients. Chlouber Dep. at 17:14-16, 36:24-37:14. Dr. Kero similarly testified that she was aware of the risk of breakage, that she counsels her patients on this risk, and that this risk exists whenever you remove a foreign body from the uterus. Kero Dep. at 44:9-21, 45:3-7. Indeed, Plaintiff's own medical expert Dr. Labib Ghulmiyyah admitted that he has known since his residency in 2001 that all IUDs can break, but he continues to use Paragard today. Jan. 28, 2026 Trial Tr. (Rough) at 23:4-8, 72:14-73:1, 77:1-3. Likewise, Teva's general causation expert Dr. Ted Anderson testified that breakage is a commonly accepted and recognized complications of all IUDs. Jan. 29, 2026 Trial Tr. at 115:10-12.

Based on this evidence, the jury could not conclude that the risk of Paragard breakage did not fall within a reasonable medical provider's expectations. In other words, there is insufficient evidence for a jury to conclude that "an objectively reasonable medical provider would believe" that breakage is not a potential risk associated with Paragard. *Cates*, 73 F.4th at 1353. Thus, judgment as a matter of law is proper on this claim even under the consumer expectations test.

**B.**     **Plaintiff did not produce sufficient evidence to support her remaining design defect theories.**

Plaintiff did not demonstrate that Paragard is unreasonably dangerous, but even if she could, judgment as a matter of law is still proper because the evidence is

not sufficient for a reasonable jury to find that either of her alleged defect theories are generally capable of causing, or in fact did cause, her alleged Paragard breakage. *See, e.g., Pierre*, 476 F. Supp. 3d at 1274, *aff'd*, 854 F. App'x at 320; *Salinero*, 995 F.3d at 964-65.

As to the theory that Teva should not have switched the base material of the Paragard Tee to DuPont 20, Dr. Mays did not opine that using the other FDA-approved base material (DuPont 2005), would have avoided breakage generally. In fact, Dr. Mays was unable to say with certainty that ***any*** Paragard Tee (much less Plaintiff's) was actually made of DuPont 20 during the time Teva owned the NDA. *See* Jan. 23, 2026 Trial Tr. (Rough) at 229:19-24. Dr. Mays theorized that the switch to DuPont 20 occurred in 2007, but the documents he cited in support of this theory only showed that the manufacturer ***purchased*** batches of DuPont 20 between 2007 and 2013.[9] On the other hand, he admitted that he had reviewed five Certificates of Conformance issued by Polymer Conversions (the company that makes the Paragard Tees) indicating that DuPont 2005 was used to make Tees manufactured in 2008, 2016, 2018, and 2019 – all after Dr. Mays' theorized "material switch" occurred in

---

[9] Jan. 23, 2026 Trial Tr. (Rough) at 217:14-16 (testifying that as of 2005, Paragard had only been made with DuPont 2005. 217:14-16.); 218:1-9 (admitting that the manufacturer had sufficient stock of DuPont 2005 to last 100 years); 221:11-14 (admitting that a document he reviewed did not state that a single Paragard was made with DuPont 2005); 226:11-17 (admitting that another document he reviewed only stated that the manufacturer tested (but did not sell) Paragard Tees made of DuPont 20).

2007. *See* Jan. 27, 2026 Trial Tr. (Rough) at 29:23-30:5. Put simply, Dr. Mays did not provide the jury with a sufficient basis to conclude that Plaintiff's Paragard was made of DuPont 20, as would be necessary to support this aspect of her design defect claim.

In addition to Dr. Mays' admissions, Teva presented testimony from Dr. Stephanie Benight recounting her review of Teva company documents, including Certificates of Conformance, from Polymer Conversions both before and after Plaintiff's Paragard placement, which showed that Teva continued to use DuPont 2005 to make Paragard even after it began purchasing DuPont 20. Feb. 2, 2026 Trial Tr. (Rough) at 110:24-111:11 (opining that the manufacturer purchased DuPont 20 and made Tees with the material for testing purposes, but clarifying that no company documents supported the conclusion that Teva commercially produced any Paragard using DuPont 20); *id.* at 112:12-115:13 (describing manufacturer inventory documents with lot number identifiers for DuPont 2005 raw material and Tee Blend); 116:7-118:6 (citing DX20030) (Drug Master File indicates that DuPont 2005 was used as the reference spectrum for Teva's FTIR testing of raw materials in 2009); 118:10-119:20 (citing DX20050) (Drug Master File indicates that DuPont 2005 was still being used as the reference spectrum for FTIR testing in 2015); 119:21-121:12 (stating that all Certificates of Conformance that Dr. Benight reviewed for Paragard Tees received from Polymer Conversions had lot identifiers

corresponding to DuPont 2005). These documents underscore the point already established through Dr. Mays' concessions – that Plaintiff cannot prove that ***any*** Paragard, much less her own, was made using DuPont 20 while Teva held the NDA. *Id.* at 121:23-122:3 (Dr. Benight stated that she was unable to locate any evidence that Teva ever used DuPont 20 to commercially produce Paragard Tees). To be clear, Plaintiff has admitted no objective evidence showing that any Paragard manufactured prior to the time of Plaintiff's placement used DuPont 20, and the only definitive evidence discussed by the parties' experts establishes that Teva did ***not*** use that material to manufacture Paragards that were sold to the public.[10]

The same is true for Plaintiff's "Barium Sulfate Theory:" Dr. Mays' testimony does not reliably establish that using any lower percentage of barium sulfate in the Paragard Tee would have avoided breakage generally. Indeed, Dr. Mays admitted that he *has no opinion* on how much barium sulfate Teva should have used within the 20-24% ash content range to avoid breakage. Jan. 23, 2026 Trial Tr. (Rough) at 203:10-15. On the other hand, Teva's materials expert Dr. Stephanie Benight testified that there is no evidence the barium sulfate particles in a Paragard Tee make the product more likely to break. Feb. 2, 2026 Trial Tr. (Rough) at 101:15-102:18.

---

[10] Dr. Benight also rebutted Dr. Mays' theory that DuPont 20 is more susceptible to oxidative degradation than DuPont 2005, pointing to test results from the manufacturer demonstrating that Paragard Tees made with both materials had "essentially identical" performance and properties. Feb. 2, 2026 Trial Tr. (Rough) at 109:18-110:18.

Dr. Benight also presented evidence of her own microscopic testing of Paragard exemplars, which showed that the "agglomeration" of barium sulfate theorized by Dr. Mays simply is not occurring in Paragard Tees. *Id.* at 99:9-101:13.

Plaintiff's claim also fails due to lack of specific causation. The specific causation requirement is a heavy burden, requiring more than a "mere possibility" of causation. *Pierre*, 476 F. Supp. 3d at 1274. Plaintiff's only specific-causation expert, Dr. Ghulmiyyah, did not identify that either of her theorized defects were *present in this Plaintiff's Paragard*. That alone defeats the claim. What is more: Dr. Ghulmiyyah—even had he identified a specific defect in Plaintiff's Paragard (and he did not)—failed to make the essential connection that either design defect *caused this Plaintiff's injuries*.

For these reasons, Plaintiff's design defect claims should be dismissed.

## IV.  Judgment as a matter of law is appropriate on Plaintiff's claims for negligent failure to warn and negligent design defect.

In a product liability case governed by Florida law, a claim grounded in negligence shares the same elements as a claim grounded in strict liability, with the added requirement that the plaintiff must prove negligent conduct by the defendant. *See Ferayorni v. Hyundai Motor Co.*, 711 So.2d 1167, 1172 (Fla. Ct. App. 1998) (citation omitted) ("a prima facie case of strict liability failure to warn does not require a showing of negligence."); *Brosius v. Home Depot Inc.*, 6:20-CV-1136-ACC-DCI, 2022 WL 1272087, at *4 (M.D. Fla. Feb. 8, 2022). Thus, while strict

26

liability and negligence may be considered independent causes of action in a purely technical legal sense, there is no practical benefit to instructing the jury on both theories, particularly given that Plaintiff lacks proof to support her strict liability claims.

Here, Plaintiff has asserted claims for strict liability and negligence that are based on the same underlying conduct – that Paragard was defective in its design and warnings, and that those alleged defects caused her injuries. Plaintiff cannot obtain a separate recovery under both theories, as this Court cogently recognized at the January 29, 2026 charge conference: "But I think just philosophically, you don't get extra damages for having the two claims, so there – there's no value damages-wise. And if someone is strictly liable, you get the damages you want, why are we also asking the jury on top of that whether they were negligent, too. What is the purpose of that? . . . . That's what I'm just conceptually not understanding is that we're complicating everything . . . ." Jan. 29, 2026 Trial Tr. (Rough) at 289:9-18. Plaintiff's counsel's response to this Court's inquiry is telling: "As plaintiffs, Your Honor, we often would like to make every single claim we can and put those before the jury as they're making their determinations." *Id.* at 290:6-8. In other words, Plaintiff was not able to articulate any case-specific reason why the jury should consider her design defect and failure to warn claims under both strict liability and negligence theories. Instead, she merely wants to influence the jury's decision by

27

making it look like she has more claims against Teva, when in reality the negligence and strict liability claims are factually identical. This should not be a legitimate basis for presenting two additional instructions and two additional verdict form questions to the jury.

Moreover, because Plaintiff's strict liability claims fail for the reasons set forth above, her negligent failure-to-warn and negligent design defect claims also fail for the reasons set forth above and should be dismissed.

## V.    Judgment as a matter of law is appropriate on Plaintiff's claims for fraud and deceit, fraud by omission, and negligent misrepresentation,

### A.    These claims fail because they are repackaged failure-to-warn/negligence claims.

Just like Plaintiff's negligent failure to warn claim, her fraud and negligent misrepresentation claims are simply re-packed versions of her strict liability failure to warn claim because they are based on the same underlying conduct. In her response to Teva's previous motion for judgment as a matter of law, Plaintiff argued that she is entitled to submit both failure to warn and fraud claims to the jury because they are considered distinct causes of action under Florida law. Dkt. No. [236] at 32. While this may be true in a purely technical sense, Plaintiff cannot deny that all of these claims turn on alleged misstatements or omissions from the product warnings, *i.e.*, that the Teva failed to warn Dr. Chlouber about the risk of Paragard breakage. Because these claims depend on the same evidence of what was said or not said to

Dr. Chlouber, they are simply re-packaged failure to warn claims and should not be presented to the jury for the reasons discussed above. *Cates v. Zeltiq Aesthetics, Inc.*, 535 F. Supp. 3d 1222, *aff'd*, 73 F.4th 1342 (11th Cir. 2023) (citation omitted).

### B. These claims fail because Dr. Chlouber did not rely on Paragard's label.

These claims also fail because Plaintiff did not produce sufficient evidence to prove detrimental reliance by Dr. Chlouber upon any allegedly fraudulent or negligent statement or omission made by Teva. To establish fraud under Florida law, Plaintiff must show "a false statement about a material fact, the defendant's knowledge of the falsity, the defendant's intent that the statement induce the plaintiff to act on it, and the plaintiff's detrimental reliance on the statement." *Shelor v. Jaguar Land Rover N. Am. LLC*, No. 3:23-CV-908-WGY-PDB, 2025 WL 1580834, at *42 (M.D. Fla. Jan. 31, 2025); *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1232 (S.D. Fla. 2021) ("To prove fraud under Florida law, a plaintiff must establish that the defendant made a 'deliberate and knowing misrepresentation designed to cause, and actually causing[,] detrimental reliance by the plaintiff.'") (quoting *First Interstate Dev. Corp. v. Ablanedo*, 511 So. 2d 536, 539 (Fla. 1987)).

The evidence cited by Plaintiff in her response to Teva's prior Rule 50(a) falls well short of demonstrating that Dr. Chlouber actually relied on any information from Teva in making his treatment decision in this case. At best, Dr. Chlouber's testimony indicates that he has read the Paragard label before. *See* Dkt. 236 at 31-32

Plaintiff also contends that Dr. Chlouber was "familiar with information from the Paragard label, such as warnings and adverse reactions," but she concedes that he learned this information through is education, training, and reading medical literature. *Id.* Plaintiff cites no evidence suggesting that Dr. Chlouber obtained any of this information from Teva, nor does she explain how any of this information constitutes a false statement or omission of material fact, as required to support her claims under this Court's jury instructions. *See* Final Pre-Closing Instructions at 11-13.

The only reasonable conclusion that a jury could reach after considering the totality of his testimony is that he ***did not rely*** on any material representation or omission by Teva concerning the risk of Paragard breakage. Dr. Chlouber testified that he had seen the Paragard label and that he reviewed it on occasion, but he never stated that he relied on the information in the label in deciding whether to treat Plaintiff with the Paragard. Chlouber Dep. at 46:25-47:4 (stating that he has read the labeling "but I do not routinely with every insertion"); *id.* at 47:5-8 (stating that he has no independent recollection of reading the Paragard labeling just prior to Plaintiff's placement); *id.* at 47:9-12 (stating that he has no recollection of reading the Paragard label at any point in time); *id.* at 47:25-48:4 (stating that he did not have any recollection of reading the label at any point after his residency). And crucially, Dr. Chlouber stated that he did not rely on the Paragard label in deciding to prescribe

30

it to Plaintiff. *Id.* at 48:5-9. He also stated that he did not depend on Teva to inform him of the risk that Paragard can break. *Id.* at 88:1-4. And at the time of Plaintiff's placement procedure, Dr. Chlouber had never had any conversations with anyone from Teva about Paragard's risks or benefits or how to place the product. *Id.* at 41:12-20. In short, he was not relying on anyone at Teva to inform him of the risks of Paragard when he prescribed the product to Plaintiff. *Id.* at 42:3-7.

And even if Dr. Chlouber had reviewed the label before prescribing Plaintiff's Paragard, it would have informed him – as he agreed during his designated trial testimony – that Paragard can become embedded, that Paragard can break, and that removing Paragard can be difficult. *Id.* at 60:6-11 ("Q. So do you agree that the Paragard labeling is informing doctors that one of the things – one of the potential complications that can occur after placing a Paragard is that you can have partial expulsion, perforation, ***or breakage*** of the Paragard? A. Yes."); *id.* at 61:3-8 ("Q. Is it fair to say that the Paragard labeling at the time that you placed Ms. Rickard's Paragard is warning doctors like yourself of the risk of the Paragard ***breaking***? A. Yes.").

For the same reason, Plaintiff has not submitted sufficient evidence of any alleged fraudulent omission made by Teva because Dr. Chlouber admitted that the operative label specifically warned of the precise outcome at issue here: breakage, requiring surgical intervention.

31

For all of these reasons, judgment as a matter of law is proper on Plaintiff's fraud, fraudulent omission, and negligent misrepresentation claims.

## VI.    Judgment as a matter of law is appropriate on Plaintiff's claim for punitive damages.

### A. Plaintiff did not present clear and convincing evidence establishing that she is entitled to any award of punitive damages.

In Florida, punitive damages "are reserved for only the most egregious cases." *Monsanto Co. v. Behar*, No. 3D24-0569, 2025 WL 1646538, at *4 (3rd DCA June 11, 2025) (cleaned up), *reh'g denied* (Aug. 15, 2025). Under Florida law, a punitive damages award requires proof, by "clear and convincing evidence," of intentional misconduct or gross negligence by the defendant. Fla. Stat. Ann. §§ 768.72(2), 768.725. Thus, Plaintiff must prove by clear and convincing evidence that Teva "was personally guilty of intentional misconduct or gross negligence," meaning it either: (1) had actual knowledge of the wrongfulness of its conduct and the high probability of injury and, despite that knowledge, intentionally pursued that course of conduct; or (2) engaged in conduct "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id*. § 768.72(2)(a)-(b).

Importantly, "clear and convincing evidence" is evidence that is "precise and explicit," "lacking in confusion," and "of such weight that it produces in the mind of the trier of fact a firm belief and conviction, without hesitancy, as to the truth of

the allegation sought to be established." *In re Fosamax Prods. Liab. Litig.*, 647 F. Supp. 2d 265, 283–84 (S.D.N.Y. 2009) (cleaned up). The Court must take this heightened burden of proof into account in deciding whether to grant a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-56 (1986). Finally, the focus of this analysis must be on whether the evidence shows that the Teva's culpable conduct (or lack of conduct) led to Plaintiff's specific injury in some way. *State Farm Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003); *see also Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260, 1269 (S.D. Fla. 2020) (granting summary judgment on punitive damages where plaintiff's evidence of defendant's conduct did not relate to plaintiff's injury); *In re Fosamax*, 647 F. Supp. 2d 265, 284–85 (S.D.N.Y. 2009) (granting summary judgment on punitive damages because the plaintiff was not "exposed" to defendant's conduct in a way that showed a disregard for her safety).

Here, because Plaintiff's underlying claims fail for the reasons stated above, her claim for punitive damages necessarily fails, too. But even if all of Plaintiff's claims do not fail, no reasonable jury could find *by **clear and convincing evidence*** that Teva's conduct rose to the level of gross negligence, let alone intentional misconduct.

In its summary judgment Order, the Court relied on *Taylor v. Mentor Worldwide LLC*, 940 F.3d 582, 598 (11th Cir. 2019), to find sufficient evidence for

33

Plaintiff's damages claim to go forward. Dkt. No. [149] at 24. A careful comparison of the evidence in *Taylor* to Plaintiff's evidence, however, demonstrates that Plaintiff's evidence here falls far below the level of "clear and convincing" and therefore her punitive damages claim should not reach the jury.

**First**, unlike in *Taylor*, there is no evidence here that: (1) any physician, let alone the inventor of the product,[11] stopped using Paragard; (2) anyone recommended that Teva take Paragard off the market; (3) Paragard sales were ever suspended; (4) Teva misled its sales force regarding Paragard's risks; or (5) Teva's sales representatives withheld instances of complications. To the contrary, the undisputed evidence shows that (1) Paragard has been approved by the FDA since 1984, (2) Paragard remains on the market to this day, and (3) Plaintiff's prescribing physician and her own medical expert continue to prescribe Paragard to their patients today.

Indeed, Dr. Ghulmiyyah knows of no professional medical organization that has found Paragard's risks outweigh its benefits. Dr. Kessler testified further that the FDA – the regulatory body charged with ensuring the safety and efficacy of drugs on the market in the United States – has never taken official enforcement action with respect to Paragard and has never issued a warning letter, recommended or requested

---

[11] The *Taylor* court noted that the inventor of ObTape mesh had stopped using the device and began using a microporous woven mesh instead, but the defendant did not disclose this fact to anyone.

a recall, taken legal action, or halt production of Paragard following a regulatory inspection of the manufacturing facility. Jan. 22, 2026 Trial Tr. (Rough) at 116:10-12, 116:25-117:25; *see also id.* at 114:12-18 (Dr. Kessler admitted that the FDA never informed Teva prior to Plaintiff's Paragard placement that it was improperly coding Paragard adverse events relating to breakage); Joseph DeVito Dep. (May 2, 2025) at 100:10-101:2 (stating that the FDA has never cited Teva for missing a trend with respect to Paragard, giving Teva a warning letter related to Paragard, seized Paragard for quality issues, or told Teva to take Paragard off the market).

Teva also never knowingly distributed any Paragard that did not meet quality standards. *Id.* at 130:5-8. Moreover, Teva employee Kenneth Piper testified that he is not aware of any Paragard adverse event that was reported to the company but not evaluated. Kenneth Piper (Nov. 17, 2023) Dep. at 289:2-7; Joyce Godshall (Feb. 13, 2025) Dep. at 337:6-13 (stating that she is unaware of any audit – internal, third-party, or FDA – that identified any problem with the safety of Paragard). To the contrary, Teva employees testified that women's health is a priority for the company. Brandon Howard (Feb. 27, 2025) Dep. at 365:21-366:9; Joyce Godshall (Feb. 13, 2025) Dep. at 305:1-4 (stating that she believes Teva prioritized patient safety); *id.* at 345:1-7 (stating that in her experience, Teva always took steps to make improvements in response to audit findings). Again, this evidence counsels against a finding – particularly by clear and convincing evidence – that Teva was engaged

in gross negligence or intentional misconduct relating to the design and warnings for Paragard.

   **Second**, while the evidence in *Taylor* showed that the defendant misstated facts in its product warnings, the evidence here is insufficient to support a similar conclusion. Plaintiff's failure to warn claims are premised on the theory that Teva failed to place information about Paragard breakage in a specific section of the label. But she cannot dispute the fact that the risk of ***breakage is, in fact, discussed in the operative label***. In fact, Dr. Chlouber agreed that the Paragard label in place in 2012 "is informing doctors that one of the things – one of the potential complications that can occur after placing a Paragard is that you can have partial expulsion, perforation, or ***breakage*** of the Paragard." Chlouber Dep. at 60:6-11.[12] Plaintiff did not present any evidence indicating that Dr. Chlouber lacked an understanding of the risk of breakage associated with Paragard.

   Plaintiff also relies on Dr. Kessler's opinion that Teva should have updated the Paragard label sooner to move the risk of breakage to the Adverse Events and Warnings sections of the label, in compliance with the FDA's PLR labeling regulation. *See* Dkt. No. [236] at 39-40. But Dr. Kessler did not testify that

---

   [12] Dr. Kessler also admitted that the FDA continued to approve supplements the non-PLR-formatted Paragard label even after it notified Teva of the need to update to the PLR format in 2013, which undermines any finding that Teva acted maliciously or recklessly in failing to update its legal sooner. Jan. 23, 2026 Trial Tr. (Rough) at 152:21-155:20; DX20768 (June 2013 Supplemental NDA).

Paragard's operative label misstated the facts or was misleading at the time of Plaintiff's implantation; indeed, Dr. Kessler could not have offered such an opinion from a clinical standpoint because his testimony was limited to the regulatory context. Testimony that Teva was late complying with a regulatory deadline to update the format of its label to change the location of a risk that was already included in the label is not "precise," "explicit," or "lacking in confusion," and therefore is not "clear and convincing" evidence that Teva acted intentionally or with conscious disregard for Plaintiff's safety.

*Third*, in contrast to the plaintiff in *Taylor*, Plaintiff here does not point to any animal studies, doctors' reports, articles, or employee reports about the risk of Paragard breakage that Teva deliberately ignored. Plaintiff relies heavily on Dr. Barton Cobert's 2011 audit of Teva's pharmacovigilance system (which was conducted **at Teva's request**) and an accompanying email and a 2012 inspection to establish that Teva consciously disregarded the risk of breakage, but these documents do not support this conclusion. First, the Cobert audit does not refer to Paragard breakage specifically or warn Teva about any risk of breakage or issues with reporting breakages.[13] Barton Cobert Dep. at 207:1-16 (stating that his audit did not focus on Paragard breakage and did not make any findings about Paragard's

---

[13] To the extent Plaintiff is basing her punitive damages claim on the theory that Teva failed to properly report adverse events to the FDA, this claim is preempted. *See Tsavaris v. Pfizer, Inc.,* 717 F. App'x 874, 877 (11th Cir. 2017)

design or label); Jan. 22, 2026 Trial Tr. at 170:12-171:6 (Dr. Kessler admitted that Dr. Cobert's audit was not specific to Paragard and did not mention Paragard breakage at all).. Dr. Cobert also did not find any missing case reports concerning Paragard during his audit. Barton Cobert Dep. at 255:20-256:1. Thus, unlike the defendant in *Taylor* that ignored warnings about specific complications, the 2011 audit did not provide any information about the specific risk of breakage and, furthermore, Teva did not ignore it. To the contrary, Joyce Godshall testified that she helped implement a CAPA in response to the findings from the Cobert audit and that those changes were implemented throughout 2011. Godshall (Feb. 13, 2025) Dep. at 342:15-344:16. Teva also hired more employees to address the issues identified in this audit – which again, were not specific to Paragard. *Id.* at 344:19-22. These are not the actions of a malicious, wanton, or reckless company.

Similarly, Teva did not ignore the FDA's 2012 inspection of the Paragard manufacturing plant, another piece of evidence Plaintiff has previously cited in support of punitive damages. The trial record shows that Teva implemented CAPA procedures to address the FDA's observations. DeVito Dep. (May 2, 2025) at 125:19-126:2. Thus, while the defendant in *Taylor* ignored specific warnings it received from animal studies, a doctors' reports, articles, and its employees, most of Plaintiff's evidence demonstrates that Teva did not receive specific warnings about breakage, and, when it did, Teva took corrective action.

38

In short, this record does not support punitive damages as a matter of law.[14] At most, Plaintiff is left with the argument (albeit unsupported) that Teva should have known more or done more to warn physicians about the risk of breakage that has been present in the Paragard label since the product was first approved by the FDA. Yet that logic—as articulated above and in Teva's prior dispositive motions—is unsupported and unsupportable given the data, medical literature, and regulatory history presented at trial.[15] Such argument is also disconnected from the straightforward facts of this case: Paragard's labeling advised physicians of the known risks of breakage and surgical removal, those rare but recognized risks occurred, and Plaintiff experienced no resulting physical complications.

For all of these reasons the Court should grant judgment as a matter of law on Plaintiff's punitive damages claim.

---

[14] *See also Thelen v. Somatics, LLC*, 672 F. Supp. 3d 1216, 1228 (M.D. Fla. 2023) ("Given the conflicting evidence and inferences that could be drawn, the nature of the product and its history, the knowledge of its purchasers and users generally and the studies and medical literature available to them, the Court concludes the evidence is insufficient to allow a reasonable juror to find by clear and convincing evidence that [defendants] acted with the requisite level of culpability.").

[15] *See In re Fosamax*, 647 F. Supp. 2d at 284 (evidence that may "create a question of material fact as to whether [defendant] *should have known* about the risk" may "fall well short of being clear and convincing evidence that [defendant] had *actual* knowledge of this risk."); *Monsanto*, 417 So.3d at 389 (reversing trial court where punitive damages were not warranted: while the manufacturer was aware of the continued reevaluation of the product, there was lack of proof that it is "carcinogenic, Monsanto knew it was, and Monsanto intentionally sold its product without a warning label anyway").

**B. Plaintiff has not presented sufficient evidence to support the application of Florida's heightened punitive damages cap or the removal of the cap.**

If the Court does not grant judgment as a matter of law on Plaintiff's punitive damages claim in its entirety, the Court should find that Plaintiff's punitive damages award cannot exceed the greater of three times the amount of compensatory damages or $500,000. Fla. Stat. § 768.73(1)(a). This cap may be raised to the greater of four times the amount of compensatory damages or $2 million only if "the fact finder determines that the wrongful conduct proven under this section was motivated solely by unreasonable financial gain and determines that the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant." *Id.* § 768.73(1)(b). There is no cap on punitive damages if "the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant." *Id.* 768.73(1)(c).

As set forth above, Plaintiff has not produced sufficient evidence for a reasonable jury to find by clear and convincing evidence that she is entitled to any award of punitive damages at all. At the very least, Plaintiff has not produced any evidence to support an award of punitive damages under the heightened cap of

Section 768.73(1)(b). This provision requires Plaintiff to show that Teva's alleged wrongful conduct was "motivated *solely* by *unreasonable* financial gain" and "that the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was *actually known*" by the relevant decisionmakers at Teva. *Id.*

In *Taylor*, the district court found that the jury was justified in awarding punitive damages under Section 768.73(1)(b) based on evidence that the defendant's executives knew that the medical device in question was *significantly more likely* to result in serious complications than other similar products on the market, but they concealed those risks so the company could continue selling the product. 2016 WL 6138253, at *13. No equivalent evidence exists in the record in this case.

Plaintiff was able to cite just four items of evidence presented during her case-in-chief that allegedly supported her "unreasonable financial gain" theory. But none of this evidence comes close to the high standard set forth in Section 768.73(1)(b).

*First*, Plaintiff relies on Dr. Kessler's "assumption" that the total number of Paragard breakages must have increased over time as the number of Paragards sold has increased. Dkt. No. [236] at 39. The Court should reject this conjecture outright, as Dr. Kessler admitted that he does not know the "denominator" representing the total number of patients who have had a Paragard placed and therefore could not calculate a breakage rate for any period of time. Jan. 22, 2026 Trial Tr. (Rough) at

108:5-13; *id.* at 108:14-109:1. This evidence falls far short of the proof in *Taylor* that the defendant's executives knew their product was seriously injuring patients at a higher rate than other similar products and concealed these facts to maintain sales.

*Second*, Plaintiff cites a statement from Teva employee Joe DeVito describing the number of people required to manufacture Paragard and the total manufacturing costs. Dkt. No. [236] at 39-40. Again, Plaintiff does not explain how a jury could make the logical leap from a generic explanation of the product's costs to a finding that Teva's conduct was "motivated solely by unreasonable financial gain." Fla. Stat. Ann. § 768.73(1)(b). Plaintiff also contends that Teva that Teva did not spend $85,000 on a computerized records maintenance system, but she points to no evidence demonstrating that Teva missed any breakage reports as a result of their decision to maintain their existing system.

*Third*, Plaintiff cites Joe DeVito's testimony concerning a single internal email that referred to Paragard as a "blockbuster . . . with the highest profit margins in Teva[.]" Dkt. No. [236] at 40. But the fact that Teva considered Paragard a profitable product, on its own, it not a sufficient basis for a jury to find that Teva's conduct was motivated ***solely*** by unreasonable financial gain. That conclusion cannot reasonably be made by reference to this testimony or any of the other evidence cited by Plaintiff to support a heightened punitive damages award.

42

*Finally*, Plaintiff points to Dr. Mays' testimony concerning a 2006 memo where a prior manufacturer of Paragard – not Teva – discussed its decision not to purchase a new mold for making Paragard Tees due to cost concerns. But Plaintiff fails to explain how a different company's decisions relating to the efficiency of material usage (an issue not relevant to this case) could somehow serve as proof that Teva acted with an unreasonable profit motive

In sum, Plaintiff has not pointed to any evidence demonstrating that Teva's alleged misconduct was motivated solely by financial gain or that Teva's financial motivation was unreasonable..[16] Further, as discussed above, Plaintiff has not introduced any evidence at trial that would permit a finding that (1) Teva ignored articles or internal reports identifying Paragard's risks; (2) anyone, including Teva employees, recommended that Paragard be taken off the market; or (3) Teva ordered its employees to stay silent regarding Paragard's risk, as occurred in *Taylor*.[17] Again, the evidence here is substantially different than the evidence in *Taylor*, and the Court

---

[16] This Court should also disregard Plaintiff's baseless references to "misleading marketing practices and potential document destruction," which are unsupported by any evidence in the record. *See id.* at 40.

[17] Plaintiffs also cites *Owens-Corning Fiberglass Corp. v. Ballard*, 749 So. 2d 483, 488-89 (Fla. 1999), to support the application of Section 768.73(1)(b), but *Ballard* was interpreting an earlier version of Florida's punitive damages statute that did not include a provision similar to Section 768.73(1)(b) or (c). Thus, *Ballard* is of no value in determining whether Plaintiff's evidence is sufficient to allow the jury to consider the heightened cap of Section 768.73(1)(b).

therefore should not allow the jury to award punitive damages under Section 768.73(1)(b).

Finally, even if the Court allows the jury to award punitive damages under Section 768.73(1)(b), the Court should not permit uncapped punitive damages under Section 768.73(1)(c) in this case.

Both the *Taylor* trial court and the Eleventh Circuit refused to permit uncapped punitive damages under § 768.73(1)(c). The Eleventh Circuit assumed without deciding that a defendant acts with "specific intent to harm" under Section 768.73(c) if it "acts 'with the purpose of producing that consequence' or 'knowing that the consequence is substantially certain to result.'" *Taylor*, 940 F.3d at 600. The court also assumed that Section 768.73(c) "does not limit uncapped awards of punitive damages to cases in which a defendant knew the identity of the claimant and intended specifically to harm ***that*** claimant." *Id.* (emphasis added). The court concluded that "[e]ven under this broad interpretation of the statute, . . . the evidence at trial was insufficient to support the jury's finding of specific intent." *Id.*; *see also id.* at 601 ("To be substantially certain that someone will be harmed as a result of wrongful conduct requires a belief much closer to total certainty, in this case, that anyone who used an ObTape would be harmed. Evidence that Mentor knew of a high incidence of injury does not reach this threshold.").

As explained above, the evidence here starkly contrasts with the evidence in *Taylor*. If evidence that Mentor's conduct in *Taylor* could not serve as a basis for uncapped punitive damages under Section 768.73(1)(c), there is no basis to remove the cap here. Moreover, there is simply no evidence in this case that Teva was "substantially certain" or believed with "total certainty" that anyone who used Paragard, much less Plaintiff personally, would be harmed.

The other cases cited in Plaintiff's prior Rule 50(a) opposition brief do not support a different conclusion. *See* Dkt. No. [236] at 41-42. Both of those cases – *Flying Fish Bikes, Inc. v. Giant Bicycle Inc.*, 181 F. Supp. 3d 957, 974-75 (M.D. Fla. 2016), and *TMCT PLLC v. Wright*, 2025 WL 4033368, at *9 (S.D. Fla. Nov. 24, 2025) – were inapposite business fraud cases where the defendants engaged in specific fraudulent conduct with the express intent of inducing the plaintiffs to rely on the fraudulent conduct. In *Flying Fish Bikes*, the court found that "Giant 'had a specific intent to harm' Flying Fish" and cited evidence showing that the defendant fraudulently induced the plaintiff into agreeing to a business deal for the purpose of increasing the defendant's sales, even though the defendant "didn't feel it was the right thing to do." 181 F. Supp. 3d at 974-75. And in *Wright*, the court granted the plaintiff punitive damages through the entry of a default judgment and found that the defendant had acted with specific intent to harm the plaintiff's business, that its fraudulent scheme would likely be repeated in the future, and that its litigation

conduct had been obstructionist and uncooperative. 2025 WL 4033368, at \*9. There is simply no evidence in the trial record here that rises to the level of the calculated fraudulent conduct at issue in *Flying Fish Bikes* and *Wright*, and neither of those cases support the imposition of uncapped punitive damages in a product liability case involving an FDA-approved prescription drug. Further, as discussed in Section V above, Plaintiff has not presented any evidence indicating that Teva made a fraudulent (or even negligent) misrepresentation or omission to Dr. Chlouber or that he relied on that misrepresentation or omission in choosing to prescribe the Paragard for Plaintiff.

For these reasons, even crediting Plaintiff's proof in the light most favorable to her, it amounts to (1) regulatory and pharmacovigilance critiques, (2) disputes about coding/communication/label formatting, and (3) generic profit-motive allegations, none of which supplies clear-and-convincing evidence that Teva intentionally pursued wrongful conduct with knowledge of a high probability of injury, or acted with conscious disregard, in a way that caused her injury. Under Florida law, punitive damages are reserved for the most egregious cases; this record does not come close, and the punitive claim should not reach the jury. But if the Court does not dismiss Plaintiff's punitive damages claim (which it should), the Court should limit any such award to the greater of three times the amount of compensatory damages or $500,000 under Section 768.73.1(a), or at the very least,

the greater of four times the amount of compensatory damages or $2 million under Section 768.73.1(b). In no circumstances should the Court permit the jury to award uncapped punitive damages under Section 768.73.1(c).

## <u>CONCLUSION</u>

For all these reasons, Teva requests that the Court grant judgment as a matter of law in its favor on each of Plaintiff's remaining claims.

Respectfully submitted,

<u>/s/ Christopher D. Morris</u>
Christopher D. Morris
Butler Snow LLP
Mississippi Bar No. 102981
Renaissance at Colony Park
Suite 1400
1020 Highland Colony Parkway
Ridgeland, MS 39158
Telephone: (601) 985-4437
chris.morris@butlersnow.com
***Co-Lead Counsel for the Teva Defendants***

<u>/s/ Pamela L. Ferrell</u>
Pamela L. Ferrell
Butler Snow LLP
Georgia Bar No. 596713
170 Peachtree Street NE
Suite 1900
Atlanta, GA 30309
Telephone: (678) 515-5011
pamela.ferrell@butlersnow.com
***Co-Lead Counsel for the Teva Defendants***

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that I have prepared the foregoing in compliance with Local Rule 5.1 in Times New Roman 14-point font.

This 3rd day of Fabruary, 2026.

*/s/ Christopher D. Morris*
Christopher D. Morris, Esq.

***Co-Lead Counsel for the Teva Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all registered attorneys of record.

This 3rd day of February, 2026.

*/s/ Christopher D. Morris*
Christopher D. Morris, Esq.

***Co-Lead Counsel for the Teva Defendants***